2025R00616/KML

RECEIVED
DEC 1 0 2025
AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Michael A. Shipp |
| v. | Crim. No. 25-700-01 (MAS) |
| BRIAN R. KAHN | 18 U.S.C. § 371 (Conspiracy to Commit Securities Fraud) |

# INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States charges:

## OVERVIEW

1. From in or around January 2017 to in or around March 2020, defendant Brian R. Kahn ("KAHN") conspired with John Hughes ("Hughes") and Co-conspirator-1 (collectively, the "Co-conspirators") to defraud dozens of investors ("investors" or "Victims") who had invested approximately $360 million in investment funds managed by Prophecy Asset Management LP ("Prophecy"), through lies, deception, false and misleading statements, and material omissions relating to, among other things, the manner and purpose in which KAHN and the Co-conspirators used money from those funds and the financial position of Prophecy's funds leading up to its collapse in or around March 2020.

## Background

2. At all times relevant to this Information:

    a. Prophecy Trading Advisors International Ltd (the "Fund") was an

1

investment company that had a place of business in Tortola, British Virgins Islands. Prophecy Trading Advisors Master Fund, LP (the "Master Fund") (together with the Fund, the "Funds") was a Cayman Islands limited partnership that was formed for the purpose of investing and trading in securities and financial instruments. Prophecy was a Delaware limited partnership and a registered investment adviser that served as the investment manager to the Fund. Prophecy's principal offices were located in South Carolina and New York.

    b. KAHN was an investment manager (called a "sub-advisor") for Prophecy who was required to invest capital from the Funds pursuant to Prophecy's "first-loss" investment model. Since in or around 2019, KAHN was also the CEO and President of a multi-billion dollar company that owned and managed large and diversified retail franchises.

    c. Hughes resided in Mahwah, New Jersey, and was Prophecy's Chief Operating Officer, Chief Compliance Officer, and co-founder. Hughes co-managed Prophecy and the Funds from his residence and from Prophecy's offices in New York.

    d. Co-conspirator-1 resided in Summit, New Jersey and was Prophecy's Chief Executive Officer ("CEO"), portfolio manager, and its other co-founder. Along with Hughes, Co-conspirator-1 co-managed Prophecy and the Funds from, among other locations, his New Jersey residence.

e. The Fund invested all of its investable assets in the Master Fund, subject to oversight by the Fund's board of directors made up of the Co-conspirators and a sole outside director, who was based in Bermuda.

f. The Victims were domestic and foreign investors in the Funds and included, among others, institutional entities, pension plans, family trusts, and high-net-worth individuals.

### The Conspiracy

3. From in or around January 2017 to in or around March 2020, in Union County, in the District of New Jersey, and elsewhere, the defendant,

**BRIAN R. KAHN,**

did intentionally and knowingly, directly and indirectly, conspire and agree with others, by the use of the means and instrumentalities of interstate commerce, and of the mails, to use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Goal of the Conspiracy

4.      The goal of the conspiracy was for the Co-conspirators to enrich themselves by obtaining hundreds of millions of dollars of Victims' funds through false and misleading statements and material omissions regarding how the Victims' investments would be used and the Funds' profitability.

### Manner and Means of the Conspiracy

5.      It was part of the conspiracy that:

#### Prophecy's Purported Low-Risk and Transparent Funds

a.      From in or around January 2017 to in or around March 2020, Hughes and Co-conspirator-1 fraudulently marketed the Funds to prospective investors as a safe, diversified, and low-risk investment opportunity. Hughes and Co-conspirator-1 claimed that the Funds offered access to a "first-loss" trading strategy that purportedly worked as follows:

      i.      Investor money was allocated to a diverse array of traders, called sub-advisors, who were sophisticated investors with proven track records of successful investing. Sub-advisors were incentivized to generate profits, because they were permitted to keep a percentage of their gains. In turn, Prophecy charged sub-advisors an administrative fee to access the Funds' capital.

      ii.      To gain access to the investors' pooled money, sub-advisors had to provide cash collateral equal to approximately 10 percent of the money they sought to invest. For example, if a sub-advisor provided cash collateral of $1 million,

Prophecy would allocate $10 million from the Funds, which the sub-advisor could use to trade in liquid assets and equities of their choosing.

iii. If a sub-advisor began to experience trading losses, Prophecy would use their cash collateral to offset the losses. If their losses approached the amount of their cash collateral, Prophecy would contact the sub-advisor to replenish their cash collateral, and, if necessary, suspend allocations and trading, or even terminate the sub-advisor if losses were substantial.

iv. In addition to the cash collateral, to ensure transparency, Prophecy monitored and tracked the sub-advisors' trading on a real-time, day-to-day basis using a proprietary trading platform. Accordingly, the proprietary platform enabled Prophecy to track a sub-advisor's trading, and quickly determine whether the sub-advisor was experiencing losses and then immediately offset those losses, or suspend or terminate allocations and trading if losses materially exceeded a sub-advisor's cash deposit.

v. An administrator oversaw the Funds monthly, and Prophecy and the Funds underwent yearly independent audits.

b. These claims were materially false and misleading. For example, in reality:

i. Prophecy did not use a diverse array of sub-advisors. Rather, over time, without informing investors, Hughes and Co-conspirator-1 allocated over 80 percent of the Funds' capital to numerous different trading entities, each overseen and controlled by a single sub-advisor, KAHN.

    ii. Over time, KAHN suffered cumulative trading losses that reached approximately $294 million by in or around March 2020. As these losses escalated, Hughes and Co-conspirator-1 continued to provide KAHN with allocations from the Funds, and did not require KAHN to provide cash collateral to back his losses. Additionally, Hughes and Co-conspirator-1 never suspended or terminated KAHN's allocations or trading.

Fraudulent Concealment of KAHN's Losses

  c. As KAHN sustained substantial trading losses that ultimately wiped out the Funds, the Co-conspirators fraudulently concealed KAHN's losses and cash collateral deficits by, among other things: (i) engaging in secret "round-trip" transactions that siphoned off cash from the Funds to KAHN, who then fraudulently used it to replenish his cash collateral and obtain more investment money from the Funds; and (ii) allowing KAHN to use fraudulent non-cash collateral to offset his losses, without disclosing that information to Victims.

***Secret "Round-Trip" Transaction***

  d. By in or around October 2017, KAHN had a cash collateral deficit of approximately $19 million based on the amount of money he had been allocated to invest from the Funds. According to the representations Hughes and Co-conspirator-1 made to Victims, Prophecy should have suspended KAHN's trading until he provided additional cash collateral. Instead, Hughes and KAHN engaged in the following series of transactions that used investor money from the Funds to replenish KAHN's cash collateral:

          i.      In or around November 2017, Hughes entered into a sham loan agreement with KAHN, whereby Hughes and KAHN purported to use money from the Funds to loan approximately $11 million to a company that KAHN owned ("Company-1"). Based on that purported loan, KAHN caused Company-1 to engage in two transfers totaling approximately $10 million to another entity that KAHN owned ("Entity-1"). KAHN then wired the approximately $10 million in two separate transactions from Entity-1 back to Prophecy and falsely designated it as a new cash collateral contribution.

          ii.      Hughes and KAHN also concealed these transactions from the Funds' administrator, auditor, and investors, by, among other things, having KAHN forge the signature of a former Company-1 colleague on the $11 million loan agreement and telling the administrator and auditor that the loan was a legitimate off-platform investment.

    *Non-Cash Collateral*

      e.      From in or around 2017 through in or around March 2020, KAHN did not provide sufficient cash collateral to secure his allocations from the Funds. During this period, KAHN sustained substantial investment losses using money from the Funds. In response, Hughes and Co-conspirator-1 allowed KAHN to secure his allocations and disguise his losses with non-cash collateral, including stocks and personal guarantees. Among other things, this allowed Prophecy to claim to its administrator and auditor that KAHN's loses were offset by non-cash collateral that could be easily liquidated. However, Hughes and Co-conspirator-1 actively concealed

this arrangement from prospective investors and Victims by falsely claiming that all sub-advisors secured their allocations with cash collateral.

    f.  The Co-conspirators concealed from Victims and the auditor that Prophecy made no effort to verify that KAHN's purported non-cash collateral had any actual value. In fact, as the Co-Conspirators well knew, virtually all of the non-cash collateral was fabricated and/or worthless. For example:

    ***Fake Preferred Stock Transfer:***

    i.  By the end of in or around 2018, KAHN had cumulative gross trading losses in excess of approximately $85 million. To reduce and offset these gross trading losses for Prophecy's year-end audit, KAHN and Hughes created a fake preferred stock agreement that purported to grant Prophecy ownership of approximately $125 million of stock in a company ("Company-2") that KAHN controlled. KAHN and Hughes created the agreement in or around April 2019 but backdated it to on or about January 1, 2018 to enable the stock to be recorded as a credit to the Funds and an asset on the Funds' 2018 balance sheet.

    ii.  Between in or around April and June 2019, KAHN and Hughes exchanged additional drafts of the agreement in which the value of the shares ranged from approximately $75 million to $150 million.

    iii.  In or around June 2019, KAHN provided Hughes with approximately two Company-2 convertible stock certificates backdated to on or about January 3, 2018, falsely showing that the preferred stock had been issued to Prophecy. One of the certificates was for approximately 75 shares with a purported

valuation of approximately $75 million; the second certificate was for approximately 150 shares with a purported valuation of approximately $150 million.

    iv. Hughes and Co-conspirator-1 did not take any steps to control or liquidate the non-cash collateral in light of KAHN's continued losses. Instead, Hughes provided the Funds' auditor with the preferred stock agreement and the $75 million stock certificate, and Hughes and Co-conspirator-1 instructed KAHN to falsely represent to the auditor that the preferred stock was issued to Prophecy and that it was collateral to secure KAHN's trading losses.

    v. In reality, Company-2 never issued the preferred stock, and the certificates were a complete fabrication.

    vi. In or around June 2019, the Fund's administrator requested information confirming KAHN's non-cash collateral in light of KAHN's increasing trading losses. In response, Hughes provided the administrator with a second Company-2 preferred stock agreement, now dated on or about January 1, 2019, granting Prophecy $150 million-worth of preferred shares. These shares were also a complete fabrication and did not exist.

   *Fake Stock Transfer*

    vii. By the end of in or around 2019, KAHN had cumulative trading losses in excess of approximately $192 million. To reduce and offset those losses for Prophecy's year-end audit, KAHN, Hughes, and Co-conspirator-1 created a limited partnership ("Company-3"), and agreed to have KAHN transfer to Company-3 approximately $194 million in stock that KAHN owned in another company.

Company-3 purportedly assigned the stock to Prophecy thereby offsetting the approximately $192 million in losses KAHN caused.

   viii. In around December 2019, Hughes and Co-conspirator-1 falsely reported the transaction to the Funds' administrator as a Fund investment, and caused the transaction to be listed as an asset on Prophecy's balance sheet as of on or about December 31, 2019.

   ix. In reality, and with full knowledge of Hughes and Co-conspirator-1, KAHN did not transfer any stock to Company-3.

   x. In or around February 2020, to confirm Prophecy's end-of-month net asset value, the administrator requested an account statement from Company-3 showing the shares purportedly transferred to Company-3. Hughes forwarded the administrator's request to KAHN. On or about February 27, 2020, with the knowledge of Hughes and Co-conspirator-1, KAHN sent a fabricated account statement to the administrator falsely showing that the value of Company-3's account was approximately $194 million as of on or about December 31, 2019 and January 31, 2020.

<u>Fraudulent Concealment of Losses From Off-Platform Investments</u>

  g. Despite claiming to investors that Prophecy closely tracked its allocations through its proprietary software platform and restricted the use of the Funds for off-platform investments, Hughes and Co-conspirator-1 made numerous failed investments and loans that were off-platform and threatened to create substantial losses to the Funds. To conceal these potential losses, the Co-conspirators

engaged in a series of fraudulent transactions designed to give the appearance that the investments had been properly redeemed. For example:

### *Off-platform Investment 1*

  i. From in or around December 2018 to in or around July 2019, Hughes and Co-conspirator-1 used money from the Funds to make off-platform investments valued at approximately $24 million in a fund ("Company-4") that was managed by a Pennsylvania investment advisor ("Individual-1").

  ii. In or around December 2018, Company-4 was in financial distress. As a result, Hughes and Co-conspirator-1 attempted to redeem the total amount of the investment. The redemption failed, and they were only able to redeem approximately $6.5 million of the approximately $24 million investment, leaving approximately $17.5 million in losses on the Funds' books.

  iii. To conceal and clear this loss from the Funds' books, the Co-conspirators agreed to engage in a series of transactions that made it appear that the investment had been legitimately purchased by an independent third party. In reality, KAHN secretly purchased the investment.

  iv. In furtherance of that agreement, in or around June and July of 2019, KAHN wired a total of approximately $17,579,885.15 to the Funds, the exact amount of the outstanding Company-4 investment.

  v. To conceal KAHN's involvement in the purchase of the investment, Co-conspirator-1 instructed KAHN to use Company-1 to purchase the investment.

    vi. On or about June 12, 2019, KAHN emailed Co-conspirator-1 an agreement, backdated to on or about April 1, 2019, assigning the interest in the investment to Company-1. In furtherance of the concealment of KAHN's involvement in the transaction, Co-conspirator-1 directed KAHN to sign the agreement using someone else's name. KAHN forged the signature on the agreement, using the first and middle names of a relative.

    vii. Pursuant to Company-4's limited partnership agreement, such assignments—even if legitimate—were prohibited. To get around this prohibition, Hughes and Co-conspirator-1 created a fake version of the limited partnership agreement that allowed for assignments, and forged Individual-1's signature on that document.

    viii. Hughes provided these fake documents to the Funds' auditor to conceal from the auditor that KAHN purchased the investment.

*Off-platform Investment 2*

    ix. In or around October 2018, KAHN had a cash collateral deficit of approximately $50 million. Despite this deficit, Hughes and Co-conspirator-1 provided an approximately $36 million unsecured loan to an asset management company KAHN controlled ("Company-5"). Hughes and Co-conspirator-1 loaned KAHN the $36 million to provide rescue financing for a company in which Company-5 and KAHN were significantly invested.

    x. On or about April 25, 2019, KAHN took an approximately $25 million loan from an investment banking company ("Company-6"). KAHN added

approximately $2.5 million of his own money and wired the $27.5 million to Prophecy as a partial payment of the Company-5 loan.

xi. On or about April 26, 2019, Hughes and Co-conspirator-1 caused Prophecy to wire approximately $17 million to a KAHN entity ("Entity-2"). KAHN then caused Entity-2 to wire approximately $8.5 million of the $17 million to Company-5, and Company-5 to wire the $8.5 million to Prophecy, completing the repayment to Prophecy, and the Funds, of the Company-5 loan.

xii. On or about April 26, 2019, Hughes and Co-conspirator-1 caused Prophecy to wire an additional approximately $19 million to another KAHN entity ("Entity-3"). KAHN used the $19 million and the remaining $8.5 million held by Entity-2 to repay himself and Company-6.

xiii. On paper it appeared that Company-5 had repaid its $36 million loan. In reality, the Co-conspirators fraudulently caused Prophecy to fund the repayment of its own loan to Company-5 with separate seemingly unrelated transfers to Entity-2 and Entity-3.

xiv. To conceal the true nature of the transactions, Hughes and Co-conspirator-1 falsely claimed to the Funds' auditor that the transfers to Entity-2 and Entity-3 were new investments. Additionally, Hughes failed to disclose to investors the true nature of the loan and the sham transactions leading to its repayment.

*The Funds' Collapse*

h. KAHN suffered substantial trading losses after January 2019,

which were not disclosed by Hughes and Co-conspirator-1 to Victims. Nonetheless, Hughes and Co-conspirator-1 continued to allow KAHN to trade and receive additional allocations from the Funds.

  i. In or around March 2020, KAHN's trading losses were approximately $294 million, causing the Funds to collapse.

### Overt Acts

  6. In furtherance of the conspiracy and the illegal object thereof, the following overt acts, among others detailed above, were committed in the District of New Jersey and elsewhere:

  a. In or around November 2017, KAHN forged the signature of a former Company-1 colleague on an approximately $11 million loan agreement to conceal his involvement in the loan, which was fraudulently used to replenish his cash collateral.

  b. In or around June 2019, KAHN provided Hughes with two fake Company-2 convertible stock certificates backdated to January 3, 2018, falsely showing that the preferred stock had been issued to Prophecy to cover KAHN's losses.

  c. On or about February 27, 2020, KAHN sent an account statement to the administrator falsely showing that the value of Company-3's account was approximately $194 million as of on or about December 31, 2019 and January 31, 2020.

  d. On or about June 12, 2019, KAHN forged the first and middle name of a relative on an agreement, backdated to on or about April 1, 2019, assigning

the interest in an investment to Company-1 and concealing his involvement in the transaction.

   e.  In or around April 2019, KAHN and his coconspirators fraudulently engaged in a series of financial transactions that were intended to conceal from the auditors and investors the true nature of an approximately $36 million loan to KAHN from the Funds.

  In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

1.    Upon conviction of the offense charged in this Information, defendant Brian R. Kahn shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, and all property traceable thereto.

## SUBSTITUTE ASSETS PROVISION

2.    If any of the property described above, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of

such defendant up to the value of the forfeitable property described above.

                         TODD BLANCHE
                         U.S. Deputy Attorney General


*/s/ Philip W. Lamparello /* bah
PHILIP W. LAMPARELLO
Senior Counsel


*/s/ Kelly M. Lyons*
KELLY M. LYONS
Assistant United States Attorney

CASE NUMBER: <u>25-700-01 (MAS)</u>

# United States District Court
# District of New Jersey

UNITED STATES OF AMERICA

v.

BRIAN R. KAHN

## INFORMATION FOR

18 U.S.C. § 371

TODD BLANCHE
U.S. Deputy Attorney General

PHILIP W. LAMPARELLO
Senior Counsel

KELLY M. LYONS
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
(973) 202-3054